OpenWave Systems v. Apple Mr. Stevenson, please proceed. Please proceed, Clyde.  The statements in the specification that were cited by the district court as terms of exclusion are actually terms of inclusion, and that's the crux of the error that means that the court should reverse the claim construction below. The patents in this case disclose software, the client module, that runs on a phone and text, generation of HTTP requests, caching of linked pages, that sort of thing. But the advantage of the computer software module is that it's efficient. It can run not just on intelligent communicators with a lot of processing capability, but it also can run on regular cell phones. Because regular cell phones are included, that doesn't mean more powerful devices are excluded, and that, I think, is the crux of the error below. In looking at the language cited by the district court in its claim construction, it repeatedly cites the language of advantage that the client devices are able to run on mobile phones that don't have a lot of processing resources. But that language doesn't rise to the level of saying that more powerful processors cannot run the program. But there's other statements in the spec too, right? I mean, when I read the patents and I look at the background of this, the background identifies a problem with current intelligent phones. They're too bulky. They're too expensive. They're too inflexible. And then the summary of the invention says, here's our solution. Unlike that, we're going with a client module. We're going with a lightweight processor. I mean, the inference is pretty strong, and this is what the district court fought off on, that the idea, the inventive concept, the inventive contribution here was to offload all the processing power for these various applications to a remote server and not have some bulky computer module contained inside your mobile device. May I offer a refinement to that? Yeah. And that is looking at the claims. The claims of the patents deal with generating an HTTP request, which is very novel in 1995. They deal with caching linked pages to speed up browsing. They deal with update notifications for apps, right? So the novelty wasn't already resident within the intelligent communicators. And in fact, there's no evidence in the record that the intelligent communicators could do anything in the claims. So the point of novelty here is not that we've created a mobile device that is thinner, cheaper, less processing power. That's an advantage of the client module. In other words, what I read the inventor as saying in about the first 20 columns of the specification is, the industry took the wrong path. The path taken by the industry was to build bulky communicators that have a client module,  I found a better way of doing it, and that is to use a lightweight software program that allows the phone, existing resources in the phone, to become a client on the network. What that means is not my client module, which has these features, can't run on more powerful devices. I mean, it certainly can, and the patent never says anywhere that it can't. When you say the patent never says anywhere, the claims, I admit, do not talk about processor size or power. But the question here is whether or not there is enough in the specification where there is a disavowal. I mean, obviously computer modules and using computer modules in the phone system was something that the entire patent was trying to move away from and touted as important to move away from. So, I mean, there's so many derogatory statements here in your specification that how do you get around them? Because of the reason they wanted to move away was for marketing reasons, right? Most of the statements say they're too bulky, they're too expensive, but there aren't any devices that can't run my program and can't parse HTML, they can't do caching of linked pages, they can't do what's claimed. And so the disavowal doesn't exist in terms of a necessity to... I don't really understand the marketing. I mean, you can build a better mousetrap because it kills mouses better, or you can build a better mousetrap because it's smaller, thinner, better looking, and people prefer to kill mouses with that. Are you saying mouses? Mises. Mises. Mises to pieces. So, I mean, you can build a better mousetrap in a variety of ways, one of which is that it's more marketable. Right. But the question then becomes, really, if I do build something more marketable, is that a disavowal of subject matter appended upon the plain meaning of my claims? And if I can give an example, let's say I was to come up with a new method of streaming video, an application that streams video, and it's a thin lightweight application, and it can run and has additional features like fast forwarding. And I say to you, I've got a new application, it's thin, it can run on a cell phone, it can run on a tablet, it doesn't take a lot of processing speed, and it doesn't take a lot of memory. It can also run on a laptop or a desktop. Have I excluded, by touting the advantage of saying you can have video in your pocket, have I excluded video on the desktop? I don't think I have in that context. And I think that's exactly the context of what is going on in this patent, where the inventor says, I have a new client module that allows a lot of features, and the specification is complete with features that aren't just based on smaller size, but are based on basically web surfing features. I guess the concern I have with your reading of the patent is the patent talks about all these problems with the prior art, right? And then, like I listed some of them off, too bulky, too expensive. Yes. And then your summary of the invention talks about how, according to the principles of this invention, the prior art limitations have been overcome. Okay, so I'm assuming those prior art limitations are too bulky, too expensive, too inflexible. I think that's right. So somehow, this invention has removed the bulk. And it removed the bulk. The only logical conclusion is it removed the bulk by swapping out the heavyweight computer module for the lightweight client module, using the existing technologies in a standard cell phone back in 1995. I agree with everything there except the word swapping out. Okay. And I would say, instead of swapping out, which implies I'm going to throw the bulky handset away, I'd read it as, we have a whole raft of devices. This is 1995, in the market. People have cell phones, and they're old cell phones, and these new communicators have come out, and they're bulky, and they're expensive, and people aren't buying them, because you can't walk around with them and make calls the way you can with a cell phone. And what the inventor says is, I've got a thin, lightweight program, it will run on the cell phone. And I've overcome the marketing problems, the commercial problems, of these intelligent communicators, which have a lot more processing power than you really need. But I don't think the inventor would have said, if asked, could your client module run on the more powerful phones? He would have said, yeah, it can. And so the question before the court is, did the inventor exclude the more powerful phones from the definition of what a mobile device is? Because they're within the plain meaning. And, Your Honor, I think in response to your question, that's why I say it's not a swap out. And that's why I say it is more of inclusion of additional devices that previously couldn't be included. Certainly, you have to agree that in at least one embodiment, it was an actual swipe out, right? Because that's the sentence on page one of your opposing counsel's brief, which comes from column 14, where it says specifically, the cellular phone 100 is not a combination of a computer module and a wireless communication module, as in prior attempts to create an intelligent phone. So at least one embodiment, it is actually a swap out. It's not an add on, right? I don't read that as a swap out, Your Honor. If I may explain. The cellular telephone is not a combination of a computer module and a wireless communication module, as in prior attempts. Okay? I'm curious. I start my reading, Your Honor, a few sentences earlier in about line 43, where the specification – they're talking about entry of a purchase order, right? And the user is able on his cell phone to essentially type in and handle an entire purchase order through the network. They first say is, quote, notice the user is entering data and not just simply selecting a menu item. The importance of that is, in the next sentence, is the user's using the cell phone as if a computer connected to the network. But as explained more below, the cellular telephone is similar to a standard digital capable cellular telephone that communicates over data capable cellular telephone network. Specifically, cellular telephone is not a combination of a computer module and a wireless communication module, as in prior attempts to create an intelligent phone. I read that as the inventor saying, look how good this cell phone can behave. But I don't read that as him saying, by the way, I intend to exclude somebody if they wanted to use the more powerful device. And as further support for that, I go down a little further into the next column, in column 15, around line 6. And there the inventor is talking about another example of essentially doing an online transaction. And he says, the processes of this invention, quote, permit cellular telephone 100 to effectively utilize an application on server computer on network, even though – and that's the only a microcontroller found in telephone and does not require a separate computer module, as in the prior part. Even though. So the word even though is word of, in my view, inclusion. In other words, this works on your phone, even though it's not a big bulky computer module. Wait, okay, time out. So are you – so this kind of goes to the argument, which I do not understand, about microcontroller and computer module. Clearly the patent acknowledges, and the district court did as well in this construction, the idea that a microcontroller can be present on a good old-fashioned cellular telephone independent of a computer module, which might also have a microcontroller. But so is that what your argument about column 14 hinges on? Because I don't understand your argument about column 14. I don't know how – you haven't explained to me, and I'm not following your argument. The sentence seems really clearly a swap out to me. Right. And so I'm not following it. So is it because you're hinging it on the idea that later on it says even though you can have a microcontroller? Because I agree with you, as did the district court, that this patent contemplates the inclusion of a microcontroller not in the computer module or in the computer module, but the microcontroller is contemplated as being allowable. Right. So what is – is that what your column 14 argument is? No, it's a little bit different. It doesn't hinge on that distinction between microcontroller and computer module. What it really hinges on is reading the specification and understanding the pride the inventor had in his invention. What he is saying in my reading here is look that I'm able to use my phone as a client on the network, and specifically, it's not a combination of computer module and wireless communication module. It's a phone. Look how great it is. But what I don't read him saying there is I intend to exclude more powerful devices from using my invention to become a client on the network. And what's very important here, your honor, is the communicators, the four or five examples that are given in the specification, they couldn't do this. So this isn't a situation where the inventor has to say to get over the prior art, I'm They didn't have these features. And what's in the record on these is a few passages that are campaigned at A, I think, 4405 on the Newton as well as the Simon. And they're basically advertising slicks for those products. You're well into your rebuttal time. Do you want to save the rest? I will stop by saying none of those prior art slicks mention the ability to get on the network, to surf the web, to do parsing of web pages, or to do caching of any sort. So these statements aren't to get over prior art. Mr. Perry? Thank you, your honor, and may it please the court. Mr. Rossman, the applicant here did not invent client server architecture. And he told us that in the specification column nine. This is line 20 or thereabouts. While client server architectures have been used extensively in computer networks, a client server architecture implemented using two way communication data devices yields new and unexpected results. That's the distinction over the prior art. Computers versus two way data communication devices. The inventor is telling us in that passage that the two way devices at issue are not computers. He then answers. But the real question is, and this is what your friend on the other side would argue, is that the mere fact that we have this separate two way data communication doesn't exclude the possibility of having that as well as a computer. It does, Judge O'Malley, with respect. On column 11, for example, about line 35, the applicant says that the devices, quote, built according to the principles of this invention, are not expected to have a significantly lower battery life than standard cellular telephones or two way pagers. If you did what Mr. Stevenson suggested this morning and installed the thin client model on a Simon from 1995, it would have had the same poor battery life, about 30 minutes, as that Simon did because of the computer module. This did not solve the problem of the computer module. Wait, wait a minute. This isn't a disclaimer. I mean, first off, the idea, certainly you'll agree that this patent absolutely discloses putting a client module onto a cell phone without a computer module. There's no doubt that is the thrust of what is disclosed here. And this sentence just says building it this way, you're going to have significantly lower problems with battery life and other things. Your Honor, we definitely agree that it discloses installing the client module in a standard cell phone. In fact, the invention here... Just because it discloses disclosing it in a standard cell phone and the advantage that would be achieved by that, I don't see how that sentence morphs. And I'm not even sure you highlighted that sentence, so it's strange to me that you're leading with it because I think I highlighted everything in the patent you highlighted. But in any event... We have a highlighted version here. But I don't see that sentence standing alone by any means as a disclaimer. So why don't you move to the better arguments that you have. As in all things, it is not any stand-alone sentence or snippet. This briefing is a little bit of the battles of snippets. We would submit that this case ought to be resolved as all claim construction cases by reading the specification as a whole to the claims. The claims require, at least in the 409 and 447 patent, the client module running on a processor. We know that. There is a hardware limitation in these claims. So what is the processor? Is it a microcontroller or is it a computer module? We know that it is not a computer module by at least four steps. First, there is in one embodiment, figure six, a disclosure of exactly what the microcontroller is. It's block 610. It's an analog devices model SP-TTT01. But you can see that that was just as to one embodiment. Absolutely, Your Honor. But that is showing us what the microcontroller was. That is not a computer. We know that from the state of the art in 1995. Second. Speaking of the state of the art in 1995, do we have to find that there is evidence to conclude that this was necessary to overcome prior art in order for us to find a disavowal? Absolutely not, Your Honor. We made that point in response to the inventors argument in this court, which they did not make below that there was no reason for this disavowal. There was a reason for the disavowal, which was to take into account the prior art. Prior art computer systems could run applications on servers. That's absolutely undisputed. In fact, that's how email has always worked. The email resides on the server and the client device accesses it. The prior art devices, including Simon, had email functionality using servers. That's the evidence in the record that we put in on that point so that it was not enough. All of these things, by the way, the invention here simply says that the device can send a resource request and get it back from a server. If you had done that on a computer, a desktop computer, this patent would not have issued this because that was well known in the art. Had you done that on a laptop computer, this patent would not have issued. Had you done it on a phone with a computer module, this patent would not have issued. The inventor was very carefully describing the advance over prior art computers by saying, I, for the first time, have developed client server architecture for non-computers. I can take the little tiny bit of processing power and memory. And if you look at the description in one of the embodiments, it is truly a tiny amount. 64 kilobytes, one MIPS of instructions, and say I can use that tiny bit of processing power that existed. But why? I don't understand why, I don't know, I feel like you're taking on a bigger burden than you need to, but more power to you. Why are you saying it's absolutely clear he could not have gotten these claims on a standard cell phone with a computer module? Why? These claims and this invention add lots of advantages even to a big, bulky phone. For example, dynamic processing, right? You don't have to re-burn stuff on the old-fashioned phone. You can dynamically interact with the server, therefore gain access to lots of additional applications without more power consumption. Not necessarily replacing the old computer module in terms of its power consumption, but you could get even more by adding this client server onto the old phone. So you're telling me there's absolutely no way they would have gotten this without replacing the computer module, and I just don't see that that's even correct, and nor was it decided below, it doesn't seem to me. Your Honor, the invention is proposing an alternative approach, and the patent uses that term, approach. I don't want to talk about the invention's proposal, I want to talk about what you just said. In response to Judge O'Malley, you said they couldn't have gotten these claims if they had added a client module onto an existing, big, which you held up, prior art cell phone. I didn't think that that was decided below. I'm surprised that you're making that claim so forcefully to us, because it doesn't necessarily seem clear to me by any stretch. Your Honor, let me go back to Column 9, where the applicant, the inventor, tells us what's involved. While client server architectures have been used extensively in computer networks, it's new and inventive in use in two-way data communication devices. The distinction that is being drawn is between those devices and computer devices, and when we read this specification over and over again, that's Column 9, Your Honor, about line 20. In the 409 patent, it's lines 18 through 21. The distinction being drawn throughout this patent is between computers or computer modules on the one hand and two-way data devices on the other. The suggestion now being made in this court 20 years later by Unwired Planet is that those two-way data devices included computers. Our argument, of which this is only a part, Judge Moore, is that they did not include computers from the very first line of the specification, which says the prior art attempts to combine computers and devices was not successful, citing specifically the Simon. And then it goes on to explain why. This thin client module that was developed to run on the processor, the microcontroller of a cell phone, was an alternative approach. It was a way around the limitations in computer modules. The avoidance of the prior art, whether or not it's necessary for validity, Judge Moore, it was clearly the applicant's disclosure to both the patent office and the world as to what he was doing. He said, I am not claiming a computer. I am claiming these thin client modules. And when the patent goes through over and over again in the specification, embodiment after embodiment to say... What's your best evidence that the inventor said, I am not claiming a computer module? Your Honor, the passage of Column 9 that I just read, if you follow that up with two other points, further down in Column 9 on the flexibility point, the patentee says the problem with the prior art was they all used operating systems. Well, of course, they used operating systems because they were computers. This invention, he says, bypasses the operating system because there is no computer. If it included a computer, it would include an operating system, and that advantage would not be present. Second, Judge Chen, on Column 14, Line 41, which Mr. Stevenson read to you as well, it says, quote, the user is utilizing the cellular telephone as if it were a computer on the network. That is, it is not a computer on the network. It is emulating a computer on the network. The client module running on the microcontroller makes it act like a computer, but it's not a computer. In fact, it goes on to say that, as explained more completely to go below. Excuse me. It's a standard digital telephone. And then it goes on, quote, specifically, it is not a combination of a computer module and a wireless communication module, as in prior art attempts. So here the applicant, again, is distinguishing over the prior art on the basis of the absence of a computer module. But this is clearly, I mean, you have to admit, Mr. Frey, this is an embodiment, right? I grant you there are no embodiments that show adding it in, but if this were all you had, don't you agree you'd be on thin ice? Like, if this were the only sentence in the entire specification, you had nothing else to point to. Because this, not the paragraph, but the section begins, in this example, the user, I mean, this, right? This is an embodiment. This doesn't carry you across the finish line. Judge Moore, if this were the only thing we had, I would agree with you, but it's not the only thing. The specification, again, from the background, through the summary, through the written description, every figure, every disclosure, all points in one direction. The use of the thin client module in the microcontroller as distinguished from the use of a computer module. And there is no disclosure. There is no example. There is no hint that a device with a computer module would or could or would use this invention. And let's think about what Unwired Planet's position in this court means. This patent starts out by saying the prior art devices, like the Simon, are failures. And I have come up with an alternative. Unwired Planet's argument now is these claims cover the Simon. I would submit this patent can be read in many ways, perhaps, but not to cover the very device that I name. What's your response to, your friend on the other side argues that the mere fact that they tout marketing advantages from not using a computer module is not relevant to the question of disavowal. Do you agree with that? I don't agree with that at all. These are consumer products. They are only valuable if they can be marketed to the public. The background of the invention makes clear that the failure of the prior art devices was they wouldn't fit in your pocket and they were too expensive. Therefore, people wouldn't buy them. Simon sold about 50,000 units before they discontinued it. The approach that was adopted here was allowing the then existing small phones that did fit in your pocket and could be affordable to have sort of rudimentary Internet access. They could send out a resource locator and get back a line or two of text, which was new and inventive, perhaps, but it was not Internet browsing as my colleague may have suggested. It was a very limited proto approach to the Internet. Marketing advantages, which are driven by technology, absolutely can be the scope of the disavowal because the goal of this patent, as disclosed from the very beginning of the summary of the invention, is to create a small, lightweight, affordable device with sufficient battery power that consumers would actually use it. So to dismiss the disavowal as a marketing-based point, I don't agree with either as a matter of law or as a matter of fact. It is a consumer product that the technology of the time did not allow to be made. It's an interesting patent in that respect. The patent acknowledges that in five years or more, computer modules would come down in size and cost. The applicant recognized that Moore's Law would kick in and that eventually in the future there would be smart phones. This was an approach to go around the technology that existed in 1995. That was very forthright on the applicant's part. It's the reason, by the way, we would submit that the prosecution history doesn't have anything to say about this because I don't believe anybody thought that this covered these computer modules. To answer Mr. Stevenson's question, if you had asked Mr. Rossman in 1995, does your patent cover the Simon, the only answer he would or could have given was no. At the time, the Simon didn't have a client server. The question would be, does your patent cover the Simon if you add a client module? That's not correct, Judge Moore. In 1995, the Simon had an email server, a client server-based email system made by the Lotus Corporation. That was available on the Simon in 1995. The Magic Link from Sony had the Magic Cap software, which also had a client server email system. We cite that at page 6611 of the appendix. These are in the record, Your Honor. There's not a lot of technical specs on it, but it is certainly the case that email in 1995 was a client server architecture. If the inventor is predicting that in five to ten years we're going to have smartphones that can actually have a computer module in them and satisfy all these other marketing concerns, why would he disavow them now? Because, Your Honor, this invention is not necessary in a computer. There's no reason to do it. The answer to the unasked question, I suppose, is if you have a computer, you've already got client server capability. You can already send a resource locator request to a server and get back an answer and turn it into a graphical user interface. Computers did all of that in 1995. The only thing that was inventive here was taking that capability and smooshing it down into a tiny little piece of software so that it could run on the tiny little bit of processing and memory capability on a cell phone. That was necessarily a limited invention because the cost and size and processing power and power consumption and so forth of computers was coming down. You could have seen that from before. And Mr. Rossman was very sophisticated on this. He had built intelligent communicators before this company. This was designed as a temporary workaround to a 1990s technological problem that has nothing to do with modern smartphones, which is how this patent office came about. What's the status of the re-exam? Your Honor, the patent office has declared the 037 patent or has rejected the remaining claims of the 037 patent. The applicant canceled two of them and the rest were rejected. The appeal to the PTAB is pending. I think briefing is not quite completed, but there's been no argument or decision in the PTAB. Can you tell from the re-exam how the PTO interpreted the scope of these claims? There is no scope discussion. In fact, interestingly, the debate in the re-exam, the requester, Blackberry, put in considerable amounts of prior art dealing with both computer modules and non-computer cell phones as prior art. The patent holder's principle response was to challenge the priority date and say that none of that was prior art, and so that's the basis on which the PTO decision went, and there is no construction from the PTO in that respect. Okay, Mr. Perry, let's let Mr. Stevenson have his rebuttal. Mr. Perry went over by a minute, so please have one minute for Mr. Stevenson's rebuttal time. Thank you. Thank you, Your Honor. My friend cited column nine of the specification around line 18  and, in fact, I think that passage actually supports and is one of the strongest passages in our favor. I direct the Court's attention to around line 22 of column nine, where it says, to deliver value-added applications and services to any two-way communication device, which incorporates the principles of this invention. The importance is the client module frees application developers from the proprietary operating systems of phones and other mobile devices and essentially allows open application platforms. This is being predicted in 1995. So would you allege that the Simon that Mr. Perry referred to is not a two-way data communication device? It is one. It is one. It is a two-way data communication device, yes, and if it runs the client module that practices any or all of the claims, such as we haven't talked much about predictive text entry, update notifications, also caching of websites, caching of linked pages, if it does that, it would infringe, because I don't think there is a disclaimer. And there was also another statement made by my friend that along the lines of this was a temporary workaround. It wasn't a temporary workaround. The crux of the invention, really, is what we just read, which is the ability to run a client module that turns your mobile device into a client on a network and allows the features that are claimed. There is no need for a workaround there because we basically established through this invention an ecosystem of sorts of providing software and applications that can run on the client module without regard to who is granted the phone. I don't, Your Honor. If the panel has no further questions, I will yield. We will take the case under submission.